IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

GREGORY GRAVES, *et al.*,      )
                               )
            Plaintiffs,        )
                               )
      v.                       )      CASE NO. 2:11-CV-557-WKW[WO]
                               )
CITY OF MONTGOMERY, *et al.*,  )
                               )
            Defendants.        )

## MEMORANDUM OPINION AND ORDER

## I.  INTRODUCTION

August 23, 2011, is the date scheduled for the city council election for the City

of Montgomery, Alabama.  Plaintiffs, who are registered electors in the City of

Montgomery, allege that their voting and equal protection rights will be infringed if

the August 23, 2011 city council election is allowed to proceed under the existing,

precleared district apportionment plan, which was configured based upon the 2000

federal census figures.  Defendants are the City of Montgomery, the City's mayor,

seven of the City's nine council members, and the City's clerk.

Asserting violations of § 2 of the Voting Rights Act of 1965, as amended, 42

U.S.C. § 1973, and the Fourteenth Amendment's Equal Protection Clause, Plaintiffs

seek a declaratory judgment that the existing district apportionment plan is

unconstitutionally malapportioned, and a preliminary and permanent injunction

barring Defendants from holding the city council election on August 23, 2011, under that plan.  In effect, Plaintiffs seek to delay the August 23, 2011 city council election until the districts are reapportioned either by Defendants or, if need be, by the court, based upon the 2010 federal decennial census data.

In its short life, this lawsuit has resulted in the filing of multiple motions.  The verified Complaint was accompanied by a motion for temporary restraining order, which was denied for reasons stated in a prior Order (Doc. # 4), as well as a motion for preliminary injunction (Doc. # 1).  Briefing was ordered on the motion for preliminary injunction.  (Doc. # 4.)  Defendants responded in opposition to the motion for preliminary injunction.  In the same pleading, they also moved to dismiss this action on grounds that Plaintiffs' claims are not ripe or, alternatively, fail to state a claim upon which relief can be granted because Defendants are operating within the time frame established by state and local law for reapportioning the city council districts and that time frame has not yet expired.  (Doc. # 10.)  Plaintiffs replied to those arguments.  (Doc. # 15.)

Presently at issue are Plaintiffs' motion for preliminary injunction (Doc. # 1), filed pursuant to Rule 65 of the Federal Rules of Civil Procedure, and Defendants' motion to dismiss (Doc. # 10), filed pursuant to Rule 12(b)(1) and (b)(6) of the Federal Rules of Civil Procedure.  After careful consideration of the arguments of

counsel and the relevant law, the court finds that Defendants' motion to dismiss is due to be granted for failure to state a claim and that Plaintiffs' motion for preliminary injunction is due to be denied as moot.

## II.  JURISDICTION AND VENUE

Subject matter jurisdiction is properly invoked pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4).  Venue and personal jurisdiction are not contested, and there are adequate allegations of both.

## III.  STANDARDS OF REVIEW

### A.    <u>Rule 12(b)(1):  Ripeness</u>

Because ripeness pertains to a federal court's subject matter jurisdiction, it is appropriately analyzed under Rule 12(b)(1).  *Fla. Ass'n of Rehab. Facilities, Inc. v. Fla. Dep't of Health & Rehab. Servs.*, 225 F.3d 1208, 1227 n.14 (11th Cir. 2000).

A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction asserts either a facial or factual challenge to the complaint.  *McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007) (citing *Williamson v. Tucker*, 645 F.2d 404, 412 (5th Cir. May 1981)[1]); *accord Lawrence v. Dunbar*, 919 F.2d 1525, 1528-29 (11th Cir. 1990).  A factual attack challenges "the existence of

---

[1] In *Bonner v. City of Prichard*, the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit issued prior to October 1, 1981.  *See* 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

3

subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered." *Lawrence*, 919 F.2d at 1529 (citation and internal quotation marks omitted). A facial attack, on the other hand, challenges the complaint on its face and "require[s] the court merely to look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction." *McElmurray*, 501 F.3d at 1251 (quoting *Lawrence*, 919 F.2d at 1529).

Defendants have submitted evidence in support of their motion to dismiss on ripeness grounds; hence, the motion is best treated as making a factual attack on subject matter jurisdiction. Plaintiffs also respond to the motion with their own exhibits. Unless controverted by the evidence, the allegations in the Complaint are presumed true.

**B.     Rule 12(b)(6): Failure to State a Claim**

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint against the legal standard set forth in Rule 8: "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2). When evaluating a motion to dismiss pursuant to Rule 12(b)(6), the court must take "the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff." *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). However, "the tenet that a court must accept as true all of the allegations

4

contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950 (brackets added; citation omitted). "[F]acial plausibility" exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The standard also "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of the claim. *Twombly*, 550 U.S. at 556. While the complaint need not set out "detailed factual allegations," it must provide sufficient factual amplification "to raise a right to relief above the speculative level." *Id.* at 555; *see also James River Ins. Co. v. Ground Down Eng'g, Inc.*, 540 F.3d 1270, 1274 (11th Cir. 2008) (*Twombly* formally retired "the often-criticized 'no set of facts' language previously used to describe the motion to dismiss standard." (citation omitted)).

C.    **Rule 65: Preliminary Injunction**

The decision to grant or deny a preliminary injunction "is within the sound discretion of the district court."  *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002).  To prevail on a motion for preliminary injunction, the plaintiff bears the burden of demonstrating that

> (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.

*Am. Civil Liberties Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009) (quoting *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000)).  "'A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the four requisites.'" *Id.* (quoting *All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989)).

## IV.  BACKGROUND

Plaintiffs Gregory Graves and Darryl Sinkfield are registered electors in the City of Montgomery, Alabama ("City").  (Compl. ¶¶ 2-3.)  Defendants are the City; its mayor, Todd Strange; Cornelius Calhoun, Jon Dow, Charles W. Jinright, Tracy Larkin, Arch Lee, Glen Pruitt and Jim Spear, who are seven of the City's nine council

6

members; and the City's clerk, Brenda Blalock. (Compl. ¶¶ 4-7.) The individual Defendants are sued in their official capacities only. (Compl. ¶¶ 5-7.)

The mayor and city council members are responsible for reapportioning city council districts after the federal decennial census to avoid malapportionment, in accordance with state and federal law. (Compl. ¶¶ 5-6, 11.) The City's clerk maintains "general supervisory authority and responsibility to administer elections in the City of Montgomery." (Compl. ¶ 7.)

The last apportionment of the city council districts occurred on December 19, 2001. On that date, the city council enacted an ordinance, which reapportioned the city council districts based upon data published in the 2000 federal decennial census ("2010 census"). *See* Montgomery, Ala., Ordinance 72-1001 (Dec. 19, 2001 (Ex. D to Doc. # 10). That ordinance was precleared by the Attorney General of the United States on July 8, 2002.[2] (U.S. Dep't of Justice Letter, dated July 8, 2002 (Ex. E to Doc. # 10).)

On February 24, 2011, the 2010 census data for Alabama was released, revealing that "the population of the City of Montgomery ha[d] grown, changed in

---

[2] To be clear, Plaintiffs make no allegation that Ordinance 72-2001 was invalid at its inception or that its use in prior city council elections violated fundamental constitutional or federal statutory dictates. Rather, as will be discussed, Plaintiffs' challenge focuses on Defendants' continued use of Ordinance 72-2001 in the August 23, 2011 city council election in the face of the 2010 census data.

demographics and shifted in location substantially since the 2000 census"[3] (Compl. ¶ 13), and that the existing city council districts now are "grossly malapportioned" in light of this new census data. (Compl. (preface & ¶ 13).)  With the total population in the City of Montgomery now at 205,530, the ideal population for each of the nine city council districts is 22,836 or 22,837. (Compl. ¶ 14.)  Three of the existing nine city council districts are overpopulated:  District One, where Plaintiff Sinkfield resides, is overpopulated by 3,587 or 15.7 percent; District Eight, where Plaintiff Graves resides, is overpopulated by 8,846 or 38.7 percent; and District Nine is overpopulated by 4,945 or 21.7 percent. (Compl. ¶¶ 14, 16, 17.)  Other districts are underpopulated. (Compl. ¶ 14.)  All told, the total deviation from ideal district size is 71.9 percent. (Compl. ¶ 15.)  Plaintiffs contend that the 2010 census data "provides the basis for a fair and lawful redistricting of city council districts to ensure that all electors are guaranteed that their votes are accorded equal weight in elections for their city representatives under the constitutional principle of 'one person-one vote.'" (Compl. ¶ 12.)

---

[3] The Complaint alleges that the 2010 census data for Alabama was released in March 2011. (Compl. ¶ 12.)  In his affidavit, the mayor attests that the data was "published in a media release from the U.S. Census Bureau dated February 24, 2011." (Todd Strange Aff. (Ex. F to Doc. # 10).)  The one-month discrepancy is not material for purposes of the present analysis. Given that the earlier February 24, 2011 date arguably is more favorable to Plaintiffs' position, that date is recited in this opinion.

Because Defendants "have expressed their intent" to conduct the August 23, 2011 city council election based upon the existing apportionment plan ("the 2001 apportionment plan"), Plaintiffs initiated this lawsuit.  (Compl. 2.)  In Counts One and Two of the Complaint, Plaintiffs contend that, because of the malapportionment in light of the 2010 census, Plaintiffs' "rights to equal protection under the one person, one vote principle will be violated" if the city council election takes place on August 23, 2011, "without lawful redistricting."[4]  (Compl. ¶¶ 24, 27-28.)  They further allege in Count Three that, if the election proceeds on August 23, 2011, under the existing districting plan, African-American voting strength will be diluted, in violation of § 2 of the Voting Rights Act.  (Compl. ¶¶ 32-34.)

To remedy Defendants' alleged transgressions, Plaintiffs request (1) a declaratory judgment that the current apportionment plan for the city council districts violates the Fourteenth Amendment's Equal Protection Clause and "cannot serve as a basis for city council[ ] elections in 2011 or thereafter"; and (2) a preliminary and permanent injunction restraining Defendants from using the current apportionment plan in the August 23, 2011 city county election "or any other elections."[5]  (Compl.

---

[4] The principal distinction between Counts One and Two is the relief sought.

[5] Plaintiffs concede that their injunctive relief request, if granted, "[i]n effect . . . will halt the currently scheduled city election," but assert that "the City may reschedule [the elections] as soon as it adopts a constitutional plan and obtains preclearance for it."  (Doc. # 15, at 3.)

9

9 ("Requested Relief").)   Plaintiffs further seek an order that Defendants "immediately and expeditiously accomplish lawful redistricting" of the nine city council districts based upon the 2010 census data or, in the alternative, that the court itself redistrict the city council districts and, if necessary, delay the date of the elections and any pre-election deadlines.[6]  (Compl. ¶ 29.)

Defendants concede their responsibilities under local law to reapportion based upon the increase and shifts in the City of Montgomery's population as revealed by the 2010 census data.  In fact, the mayor attests that he "ha[s] been working on a plan for reapportionment of council districts to present to the City Council before" the six-month, August 24, 2011 deadline.[7]   (Todd Strange Aff. (Ex. F to Doc. # 10).) However, Defendants confirm that they intend to hold the City's city council election on August 23, 2011, based upon the 2001 apportionment plan, and they do not concede that use of the 2001 apportionment plan in that election is unconstitutional

---

[6] Plaintiffs have attached to their Complaint a districting plan that they "aver will meet constitutional one-person one-vote standards" and "will cure any problems under the Voting Rights Act."  (Compl. ¶¶ 22, 35.)

[7] The disagreement is not whether reapportionment will occur, but rather, when it must occur.  Plaintiffs' position is that, because the 2010 census report shows that the districts, which were previously constitutionally apportioned, have become malapportioned due to population changes, redistricting must occur prior to August 23, 2011, if the city council election is to proceed as scheduled.  Notwithstanding that the 2010 census report was released only six months prior to the scheduled August 23, 2011 election and that the deadlines for redistricting under state and local law have not expired, Plaintiffs allege that "it is feasible for the City Council to redistrict for the upcoming 2011 election."  (Compl. ¶ 24.)

or in violation of § 2 of the Voting Rights Act.  Moreover, Defendants emphasize that they are in compliance with state and local law governing decennial redistricting, that the time allotted under state and local law for redistricting the city council districts has not yet run, and that altering the election date to allow the completion of reapportionment would itself violate state and local law.  (Doc. # 10, at 3-4.)

Defendants' contentions require some elaboration of the state and local law governing city council elections.  The city council comprises nine members, who are elected from single-member districts to serve four-year terms.  Act No. 618, Ala. Acts 1973, Art. III, § 3.01 (Aug. 28, 1973).  The election schedule in place for the city council elections is established by City of Montgomery Ordinance 31-2008, and § 11-46-5 of the Alabama Code.  *See* Montgomery, Ala., Ordinance 31-2008 (July 1, 2008) (Ex. A to Doc. # 10).  Pursuant to that authority, the City's regular municipal elections are to be held on the fourth Tuesday in August 2011, and quadrennially thereafter.  When necessary, a second or runoff election is to be held on the sixth Tuesday following the general election.  On April 26, 2011, the city council passed Resolution 74-2011, establishing the date for the regular scheduled municipal elections as August 23, 2011, and the date for a runoff election, if needed, as October 4, 2011.  Additionally, Resolution 74-2011 establishes the period for filing a statement of candidacy for a member of city council as commencing on July 5, 2011,

11

and ending July 12, 2011.  *See* Montgomery, Ala., Resolution 74-2011 (April 27, 2011) (Ex. C to Doc. # 10).

State law, in particular Act No. 618 of the Regular Session of the 1973 Alabama Legislature, also governs the schedule for the periodic redrawing of the boundaries of city council districts after a federal decennial census.  Act No. 618, which proposed a mayor-council form of government for the City of Montgomery, was ratified on November 5, 1974, in a special election.  *See Siegelman v. Folmar*, 432 So. 2d 1246, 1247 (Ala. 1983).  Act No. 618 is "known as a 'general act of local application.'"  *Id.*

Material to this action is Section 7.02 of Act No. 618 (attached as court's Exhibit A), which provides as follows:

> **7.02.   Reapportionment.** – Whenever there shall be a change in population in any of the nine districts heretofore established, evidenced by a federal census of population published following the last federal census of population preceding the adoption of this act, or by virtue of a change in the corporate limits, there shall be a reapportionment of the council districts in the manner hereinafter provided:
>
> (1)     The mayor shall within six months after the publication of each federal census of population for the city, following the last federal census of population preceding the adoption of this act, or if within six months after there shall have been any change in the corporate limits of the city, file with the council a report containing a recommended plan for reapportionment of the council district boundaries to comply with the following specifications:

(a)     Each district shall be formed of contiguous and to the extent reasonably possible, compact territory, and its boundary lines shall be the center lines of streets or other well defined boundaries.

(b)     Each district shall contain as nearly as is reasonable the same population.

(2)     The report shall include a map and description of the districts recommended and shall be drafted as a proposed ordinance and considered by the council as other ordinances are considered.  Once filed with the clerk, the report shall be treated as an ordinance introduced by a council member.

(3)     The council shall enact a redistricting ordinance within six months after receiving such report.  If the council fails to enact the redistricting ordinance within the said six months, the redistricting plan submitted by the mayor shall become effective without enactment by the council, as if it were a duly enacted ordinance.

(4)     Such redistricting ordinance shall not apply to any primary or regular or special election held within six months after its becoming effected. No incumbent councilman or member of the board or commission shall be deprived of his unexpired term of office because of such redistricting.

Pursuant to Section 7.02, the mayor and city council are assigned duties for redistricting city council districts when the federal census evidences population changes in any city council district.  Here, the reapportionment process was triggered by the publication of the 2010 census data on February 24, 2011.  The mayor now has until on or about August 24, 2011, to submit a plan to the city council.  That plan must apportion districts that are substantially equal in population, that consist of

13

contiguous, compact territories, and that contain well-defined boundaries.  The city

council then has until on or about February 24, 2012, to enact a redistricting

ordinance, but if it fails to do so, the mayor's plan becomes the ordinance on that date

by operation of law.  If the ordinance is not enacted until the last permissible day,

Section 7.02 provides that it cannot be used in a regular or special city council

election until on or about August 24, 2012.[8]  This means that, pursuant to Section

7.02, the August 23, 2011 city council election must be based upon the 2001

apportionment plan, unless, of course, the election is enjoined by this court.  This also

means that the city councilors who are elected will take office on November 8, 2011,

*see* Act. No. 618, Art. III, § 3.01, and will serve their full, four-year terms, *see* Act.

No. 618, Art. VII, § 7.02.

## V.  DISCUSSION

### A.    Rule 12(b)(1):  Ripeness

Defendants suggest that this action is not ripe for review because the time for

redistricting the city council districts under Section 7.02 of Act No. 618 has not

concluded.  Defendants assert that not only is the mayor still operating permissibly

within the time frame of Act No. 618, but also that, even if a redistricting plan were

---

[8] Presumably, during this six-month gap, the reapportionment ordinance would be submitted for preclearance by the United States Attorney General, as provided in § 5 of the Voting Rights Act.  *See* 42 U.S.C. § 1973c.

enacted today, Act No. 618 would preclude Defendants from using the plan for the August 23, 2011 election.  *See* Act No. 618, Art. VII, § 7.02 (providing that a new "redistricting ordinance shall not apply to any primary or regular or special election held within six months after its becoming effected").  Moreover, Defendants argue that there is no state or local law that permits a stay of the August 23, 2011 election date until such time that a redistricting ordinance is enacted, and that, in fact, altering the August 23, 2011 elections date would violate state law.  All of this is to say, according to Defendants, that this action is not ripe until they have been given an opportunity to redistrict in accordance with Section 7.02 of Act. No. 618.  On the other hand, Plaintiffs argue that the dispute is not whether Defendants are in violation of state or local law, but whether the mere fact of holding an election based upon districts, now malapportioned in light of the 2010 census, violates federal constitutional guarantees and federal statutory law.

The ripeness doctrine, one of the "several strands of justiciability," goes "to the heart of the Article III case or controversy requirement."  *Mulhall v. UNITE HERE Local 355*, 618 F.3d 1279, 1291 (11th Cir. 2010) (citation and internal quotation marks omitted).  "[R]ipeness concerns the timing of the suit," *id.*, and "protects federal courts from engaging in speculation or wasting their resources through the review of potential or abstract disputes," *Digital Props., Inc. v. City of Plantation*,

121 F.3d 586, 589 (11th Cir. 1997). "In other words, '[c]ourts must resolve . . . whether the claim is sufficiently mature, and the issues sufficiently defined and concrete, to permit effective decisionmaking by the court.'" *Pittman v. Cole*, 267 F.3d 1269, 1278 (11th Cir. 2001) (quoting *Digital Props.*, 121 F.3d at 589).

Although Defendants cite these general principles of ripeness, they do not elaborate or cite an analogous or instructive case, and Plaintiffs similarly give the important jurisdictional subject of ripeness short shrift. Courts have wrestled with the justiciability of arguably premature redistricting lawsuits that allege federal constitutional and statutory violations. *See Arrington v. Elections Bd.*, 173 F. Supp. 2d 856, 860-67 (E.D. Wis. 2001) (collecting cases and discussing how principles of abstention, standing, ripeness and stays have impacted court decisions in redistricting cases). This court also has wrestled with ripeness. Following the threads of decisions in other jurisdictions, the call is not an easy one, but a few cases have helped guide the decision.

In *French v. Boner,* 940 F.2d 659, 1991 WL 151016 (6th Cir. Aug. 8, 1991) (unpublished), the action was held "ripe for decision." *Id.* at *1. There, the plaintiffs sought to enjoin the then-upcoming August 1, 1991 local council elections on the undisputed ground that the districts, which were apportioned based upon the 1980 federal decennial census, were malapportioned in light of the 1990 federal decennial census.

16

Vacating the district court's order dismissing the case on ripeness grounds, the Sixth

Circuit explained that

> the necessary facts are known as to the August 1, 1991, election.  The
> district lines, drawn according to the 1980 census, are known and are
> known to be malapportioned according to the 1990 census.   The
> problem is that the Metro government did not receive the 1990 census
> figures until mid-March leaving insufficient time to reapportion before
> the August 1 elections, given the procedural requirements for
> reapportionment under § 18.06 of the city charter and the fact that
> reapportionment must be completed and district lines established almost
> 90 days in advance of the election.  We conclude therefore that the issue
> of whether the impending election may be conducted, or must be
> enjoined, is ripe for decision.

*Id.* at *1.  In *French*, given the time constraints imposed by local law, the legislative

body was incapable of reapportioning the districts, based on the new federal census

data, in time for the upcoming election.  Thus, the issue focused on whether a delay

of the redistricting until after the election comported with constitutional requirements.

That issue was ripe and ultimately was decided in favor of the Metro government.

Injunctive relief was denied.

In *Flateau v. Anderson*, 537 F. Supp. 257 (S.D.N.Y. 1982), the redistricting

suit alleging violations of federal law was filed prior to the state legislature having

reapportioned districts based upon new federal decennial census data, but because the

legislature was then in session, there was still time for it to act before the upcoming

general election.  *Id.* at 262.  Nonetheless, it was clear that the legislature was not

17

likely to reapportion before the next general election unless the court intervened, given that state law permitted additional time for reapportionment. The case was deemed ripe. *See id.*; *see also Arrington*, 173 F. Supp. 2d at 866 (describing *Flateau* and linking the fact that "enforcement of the now-outdated apportionment was likely" to the conclusion that the case was "clearly 'ripe' for purposes of Article III jurisdiction").

A different set of circumstances than in *French* and *Flateau* was presented in *Carter v. Virginia State Board of Elections*, No. 3:11cv7, 2011 WL 665408 (W.D. Va. Feb. 15, 2011), and ended in a different result. *Carter* involved a constitutional challenge to the apportionment of the Virginia senate districts, which the plaintiffs claimed were malapportioned based upon the 2010 census data. Although a districting plan based on the 2010 census data had not yet been formulated, the court observed that the Virginia General Assembly at that time had eleven days left in its regular session to reapportion the districts, that primary elections for senate seats were not scheduled until June 14, 2011, and that it was forecasted that legislation would be passed extending the June 14, 2011 date. *Id.* at *2 & n.2. The court also noted that, after the release of the prior 2000 federal decennial census data, the governor and the Virginia General Assembly agreed that a redistricting plan would be finalized during a special session ending in April 2001. *Id.* In *Carter*, there was

no reason to believe that the general assembly was unwilling or incapable of reapportioning the districts in time for the next election, *see id.* at *2; thus, the action was dismissed as "not ripe for review." *Id.* at *1.

For purposes of analyzing ripeness, this action is distinguishable from *Carter* in a material respect. According to Defendants, the city council election will proceed on August 23, 2011, based upon the 2001 apportionment plan, in accordance with the time frames established by state and local law. Those time frames do not provide sufficient time to complete a new plan for use in the August 23, 2011 election. In other words, it is known here that elections will proceed under the now-malapportioned 2001 apportionment plan. In *Carter*, it was too early to know whether redistricting could be accomplished based upon the new federal decennial census data and from aught that appeared, a new redistricting plan very well could have been implemented in time for the elections. In short, because elections based upon malapportioned districts was a speculative event in *Carter*, the lawsuit was not ripe.

This case is more akin to *French* and *Flateau*. It is known that an impending city council election is scheduled for August 23, 2011, and that no change in that date is anticipated. It also is known that, although in progress, reapportionment of the city council districts based upon the 2010 census data will not occur prior to August 23,

19

2011, because of time constraints set out in Act No. 618.  It also is known that, even if a redistricting plan were enacted as soon as today, the new plan could not be used for the August 23, 2011 election because Act No. 618 requires district lines to be in effect at least six months in advance of an election.  Hence, all the facts needed to resolve whether the city council election should proceed as scheduled on August 23, 2011, without reapportionment based upon the 2010 census data, or be enjoined, are known.  As discussed below, this issue requires consideration of whether Act No. 618 is a "reasonable plan for periodic revision of [Defendants'] apportionment scheme[ ]," *Reynolds v. Sims*, 377 U.S. 533, 583 (1964), so as to justify a post-election reapportionment.  That issue is "sufficiently mature" and development of additional facts is not required to permit an effective decision.  *Pittman*, 267 F.3d at 1278 (quoting *Digital Props.*, 121 F.3d at 589).

This conclusion was not reached without some difficulty.  That is because the mere fact that a districting plan is shown to be malapportioned on the basis of some intervening event, such as a federal decennial census, does not mean that a federal court must automatically inject itself into a state or local government's legislative functions of reapportionment.  As discussed later in this opinion, where a state has a "reasonably conceived plan" for decennial reapportionment of districts that comports with equal protection standards, the Supreme Court of the United States has

20

recognized that districts undoubtedly will suffer from "some imbalance in the population . . . toward the end of the decennial period." *Reynolds*, 377 U.S. at 583. However, such imbalances do not require judicial intervention, as "legislative reapportionment is primarily a matter for legislative consideration and determination," unless the "legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so." *Id.* at 586. And even then, "under certain circumstances, such as where an impending election is imminent and a [governmental entity's] election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid." *Id.* at 585.

Ultimately, Plaintiffs' action falters on the basis of these principles espoused in *Reynolds*. However, the ultimate determination requires consideration of, among other things, the reasonableness of the City's plan for reapportionment of city council districts. Thus, Defendants' argument that the case is not ripe because the time has not yet run under the City's apportionment procedures may put the merits cart before the jurisdictional horse, or at least entangle the two. Hence, assuming this action to be ripe, the court turns to the merits.

**B.**     <u>**Rule 12(b)(6):  Failure to State a Claim**</u>

Plaintiffs bring two substantive claims, one under the Equal Protection Clause of the Fourteenth Amendment and the other under § 2 of the Voting Rights Act. Plaintiffs urge the court to intervene in a local redistricting scheme and to halt the well-greased election machinery wheels of the impending city council election.

The analysis appropriately begins with the admonition that a federal court should tread carefully when asked to interfere in delicate areas of local election matters.  Although there is no question that "federal courts have the power to enjoin [local] elections," such intervention "has always been a serious business, not to be lightly engaged in."  *Chisom v. Roemer*, 853 F.2d 1186, 1189 (5th Cir. 1988).  And, "legislative reapportionment is primarily a matter for legislative consideration and determination," and that task should remain with the legislative body, unless it "fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so."  *Reynolds*, 377 U.S. at 586.

### 1.     *Equal Protection Clause*

"The Equal Protection Clause requires that representatives to an elected body be drawn from voting districts of substantially equal population."  *Chen v. City of Houston*, 206 F.3d 502, 522 (5th Cir. 2000) (citing *Reynolds*, 377 U.S. at 568 (holding that the Fourteenth Amendment's Equal Protection Clause requires

22

reapportionment of state legislatures to be on the basis of population)).  "This guarantee extends to local elections."  *Id.* (citing *Avery v. Midland Cnty.*, 390 U.S. 474 (1968) (holding "that the Constitution permits no substantial variation from equal population in drawing districts for units of local government having general governmental powers over the entire geographic area served by the body," *id.* at 484-85)).

Defendants' overarching theme is that, because the process for reapportioning the city council districts based upon the 2010 census data has begun and is being conducted in accordance with the time frames established by state and local law, Plaintiffs' Complaint fails to state a claim for which relief can be granted under the Equal Protection Clause (and § 2 of the Voting Rights Act).  Plaintiffs counter that state and local redistricting law cannot trump federal constitutional law and "empower a state or local official to deny the equal protection of the laws to the city's residents."  (Doc. # 15, at 1.)  This they do without directly challenging the constitutionality of Section 7.02 of Act No. 618.  They allege that permitting the August 23, 2011 election to take place under the 2001 apportionment plan will deny Plaintiffs their fundamental rights to equal protection as guaranteed by the Fourteenth Amendment, regardless whether Defendants are in compliance with state and local law.  Accordingly, they seek injunctive relief, both preliminary and permanent,

prohibiting Defendants from using the 2001 apportionment plan for the city council election on August 23, 2011.

Plaintiffs rely upon *Reynolds*, where the electors brought an equal protection challenge to Alabama's apportionment scheme of its state legislature that had resulted from its failure to reapportion decennially. But, ironically for Plaintiffs, *Reynolds* pronounced the very principles that dispose of Plaintiffs' equal protection claim, both on the merits and as to the relief requested.

As touched on earlier in this opinion, *Reynolds* recognized that decennial reapportionment complies with the Equal Protection Clause, even where population imbalances result at the end of the reapportionment period:

> Decennial reapportionment appears to be a rational approach to readjustment of legislative representation in order to take into account population shifts and growth. Reallocation of legislative seats every 10 years coincides with the prescribed practice in 41 of the States . . . . Limitations on the frequency of reapportionment are justified by the need for stability and continuity in the organization of the legislative system, although undoubtedly reapportioning no more frequently than every 10 years leads to some imbalance in the population of districts toward the end of the decennial period and also to the development of resistance to change on the part of some incumbent legislators. In substance, we do not regard the Equal Protection Clause as requiring daily, monthly, annual or biennial reapportionment, so long as a State has a reasonably conceived plan for periodic readjustment of legislative representation. While we do not intend to indicate that decennial reapportionment is a constitutional requisite, compliance with such an approach would clearly meet the minimal requirements for maintaining a reasonably current scheme of legislative representation. And we do

24

not mean to intimate that more frequent reapportionment would not be constitutionally permissible or practicably desirable. But if reapportionment were accomplished with less frequency, it would assuredly be constitutionally suspect.

377 U.S. at 583-84 (internal footnote omitted).

Here, Defendants have a plan in place to reconfigure city council districts every ten years. That plan is embodied in Section 7.02 of Act No. 618, which requires decennial reapportionment of city council districts. The decennial reapportionment works in tandem with the release of the federal decennial census data of population for the City of Montgomery: "Whenever there shall be a change in population in any of the nine [city council] districts . . . , evidenced by a federal census of population preceding the adoption of this act, . . . there shall be a reapportionment." Act. No. 618, Art. VII, § 7.02. The publication date of the federal census data as to the City of Montgomery's population triggers the Section 7.02 clock for enacting a restricting ordinance, and that clock stops ticking, at the latest, at the one-year mark. The mayor has six months after the census's publication to prepare and submit to the city council a recommended plan for reapportionment of the city council districts, after which the city council has six months to enact a redistricting ordinance or the mayor's redistricting plan becomes effective as the ordinance by operation of law. *See* Act No. 618, Art. VII, § 7.02.

25

Plaintiffs do not argue that Act No. 618's layered time constraints for redistricting are unconstitutional, nor do they dispute that it is nearly impossible under Act No. 618 for a redistricting plan to be in place for an August city council election, when the publication of the federal decennial census data and the election fall in the same year.  Rather, Plaintiffs ignore Act No. 618 and ask this court to do the same and to hold Defendants constitutionally accountable if redistricting is not completed in time for the August 23, 2011 election.  This the court cannot do.

In *Political Action Conference of Illinois v. Daley*, 976 F.2d 335 (7th Cir. 1992), the Seventh Circuit answered the question of how long is too long under the Constitution for the completion of redistricting, by looking to *Reynolds*:

> Redistricting is complex; obtaining new census data is merely the first step toward developing and approving a new map for the City. Therefore, the critical question is whether the 1991 election, which was based on a ward map approved in 1985 using 1980 census data, was valid under *Reynolds*[.]  *Reynolds*' explicit language concerning the probable "imbalance" in the map toward the end of the decennial period demonstrates that Chicago's 1991 election represents no constitutional violation.

976 F.2d at 340.  In *Daley*, whether the 1991 election was valid under *Reynolds* depended upon whether there existed a "'reasonably conceived plan for periodic readjustment'" of Chicago's aldermanic wards.  *Daley,* 976 F.2d at 339 (quoting *Reynolds*, 377 U.S. at 583).  The redistricting plan at issue in that case had qualities

26

similar to Act No. 618.   There, an Illinois statute provided for decennial reapportionment after the release of federal decennial census data.  The state statutory deadline for the city council to redistrict was December 1 of the year after the census was conducted, which in *Daley* meant that December 1, 1991, was the deadline.  976 F.2d at 337.  If, however, the city council failed to meet that deadline, which is what occurred in *Daley*, a state statute provided a procedure whereby redistricting maps were placed on the ballot for referendum at the next election, which in *Daley* occurred in March 1992.  *See id.* at 338.

In *Daley*, as here, it could take up to a year under state law for a redistricting ordinance to be enacted after receipt of federal census data.  The redistricting scheme in *Daley* was held constitutional under *Reynolds.  See Daley*, 976 F.2d at 339 ("[T]he Illinois statutory scheme for reapportionment passes constitutional muster [because] Illinois requires decennial redistricting that tracks the figures from the most recent census.").  This court likewise finds that Act No. 618 passes constitutional scrutiny as a reasonably conceived plan, "tied to the decennial census, to accomplish the necessary period adjustment."  *Ramos v. Illinois*, 781 F. Supp. 1353, 1357 (N.D. Ill. 1991), *aff'd*, *Daley*, 976 F.2d 335.

If Defendants are complying with a reasonably conceived plan that results in decennial reapportionment of the City's city council districts (and Plaintiffs make no

27

contrary allegation as to Defendants' compliance), they satisfy "the minimal requirements for maintaining a reasonably current scheme of legislative representation," under the Equal Protection Clause. *Reynolds*, 377 U.S. at 583-84. *Reynolds* neither requires Defendants to complete the redistricting process in time for the August election, nor requires this court to enjoin the elections until the population asymmetries are cured. As recognized in *Daley*, nothing in *Reynolds* holds that only immediate redistricting after receipt of federal decennial census data satisfies constitutional mandates. *See Daley*, 976 F.2d at 340. Lag times in redistricting were not constitutionally shunned in *Reynolds*, but, to the contrary, expressly were "justified by the need for stability and continuity in the organization of the legislative system," notwithstanding the resulting "imbalance in the population of districts toward the end of the decennial period." 377 U.S. at 583; *see also Daley*, 976 F.2d at 340. The fact that the elections proceed with population "imbalance" toward the end of a decennial period is of no constitutional consequence under *Reynolds*.

Also significant is that Plaintiffs have not alleged or argued, as the plaintiffs in *Reynolds* did, that Defendants have failed to reapportion city council districts on a decennial basis, as required by Section 7.02 of Act No. 618. In fact, the city council districts were reapportioned less than ten years ago on December 19, 2001, after the publication of the 2000 census data. Plaintiffs also have not alleged or argued that

28

reapportionment of the city council districts is not presently proceeding in accordance with the process and time frame laid out in Section 7.02.    That should end the inquiry, but it does not.     Plaintiffs argue that Defendants' "pleas of 'we'll get it done' [under the time constraints imposed under Section 7.02], ignores the fact that the current districts will be frozen in place for the next four years once an election using them held."  (Doc. # 15, at 3.)  Plaintiffs argue that they "deserve to have equal protection now, not four years from now."  (Doc. # 15, at 3.)  The argument lacks merit.

The source of Plaintiffs' vexation is the fact that this year, the four-year election cycle falls in the middle of the redistricting time frame allotted by Act No. 618.  Plaintiffs argue that postponing redistricting until after the August 23, 2011 election has the effect of allowing the 2001 apportionment plan to remain in effect through 2015, when the four-year terms of the next city councilors expire.  That, Plaintiffs urge, is unconstitutional.  In *Daley*, the Seventh Circuit rejected this identical line of attack:

> That Chicago elects its aldermen to serve four-year terms causing a temporary delay in the implementation of the new census data every twenty years does not transform Illinois' scheme into an unconstitutional procedure.  As . . . *Reynolds* makes clear, decennial reapportionment satisfies the Constitution, even though there undoubtedly will be "some imbalance" in the population of each district towards the end of the decennial period.

29

976 F.2d at 339-40 (quoting *Reynolds*, 377 U.S. at 583-84). The court finds *Daley*'s reasoning persuasive and applies it here.

The holdup in implementing the 2010 census data into the redistricting scheme for this year's city council election is a phenomenon that occurs only once every twenty years. That is, in most election years, Act No. 618 provides sufficient time for reapportionment prior to the general election that follows the publication of federal decennial census data for the City of Montgomery. For example, the next general election for city council positions will take place in August 2015, well after the outer time limits provided in Act No. 618 for a redistricting ordinance to become effective for use in a general election. Given the four-year election terms for city council members, only one out of every five election cycles falls in the same year the federal decennial census data is published; thus, this overlap will not recur until 2031. This overlap is of no constitutional consequence.

In sum, use of the 2001 apportionment plan for the August 23, 2011 city council election will not violate the Equal Protection Clause. Plaintiffs' equal protection claim is, therefore, due to be dismissed.

Moreover, Plaintiffs' claims in Counts II and III that seek injunctive relief as the sole remedy fail based upon another principle set out in *Reynolds*. *Reynolds* explained that

under certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid. In awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles. With respect to the timing of relief, a court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree.

*Reynolds*, 377 U.S. at 585 (internal footnote omitted).

The circumstances referred to in *Reynolds* weigh strongly against halting the impending August 23, 2011 election. When this action was filed on July 11, 2011, the election machinery wheels were in full rotation. On that July 11 date, three-and-a-half months had elapsed since the city council had passed a resolution setting the regular scheduled municipal election on August 23, 2011, a runoff election, if needed, on October 4, 2011, and a candidacy qualifying period of July 5, 2011, through July 12, 2011. *See* Resolution 74-2011. Also, barely more than one working day remained under the eight-day period for candidates to qualify to run for city council, and only six weeks remained until election day. Moreover, the August 12, 2011 voter registration and August 18, 2011 absentee application deadlines were fast approaching.

31

To stop the election would not only substantially disrupt the City's election process at great expense, but also would have detrimental effects on the candidates and voters. The qualifying candidates are in the midst of their campaigns, and voters no doubt are in the process of sorting through the candidates' qualifications in reliance on the August 23, 2011 election date. A delayed election would deprive citizens of their right to replace public officials whose terms will expire soon. In that regard, the concerns pronounced by a colleague on the court apply equally here: "The court does not wish to be left in the position of having either to extend the terms of incumbents or to appoint temporary replacements to serve until the new plans are in place. Both alternatives would effectively deny the entire electorate the right to vote and thus seem to offend the basic principles of representative government." *Dillard v. Crenshaw Cnty.*, 640 F. Supp. 1347, 1363 (M.D. Ala. 1986).

The impending election falls squarely within the *Reynolds*' time frame of imminency. Accordingly, even if a constitutional claim were stated on the face of the Complaint, Plaintiffs' request for injunctive relief to enjoin the August 23, 2011 election would have been denied.

2. *Section 2 of the Voting Rights Act*

Plaintiffs bring a claim in Count III of the Complaint, contending that the current districting plan violates § 2 of the Voting Rights Act.  They allege that an election based on the current districting plan will result in "the abridgement or dilution of the right to vote or to participate in the political process on account of the voters' race or color," in particular, because of the increase in the City's African-American population in certain districts.  (Compl. ¶¶ 32-33.)

A similar Voting Rights Act claim was at issue in *Daley*.  *See* 976 F.2d at 340-41.  The district court found no principled reason to depart from the *Reynolds* standard in evaluating a claim brought under the Voting Rights Act.  *See Ramos*, 781 F. Supp. at 1356 ("We are not aware of anything that suggests that Congress intended to change [the *Reynolds*] standard for the purposes of the Voting Rights Act.").  The district court then rejected the equal protection claim, as well as the Voting Rights Act claim, as failing under *Reynolds*.  On appeal, the plaintiffs asserted that the districting map, although originally valid in 1985, had turned discriminatory based upon population shifts evidenced by the 1990 federal decennial census report and, thus, denied racial minorities "an equal opportunity to participate in the political process and elect representatives of their choice."  976 F.2d at 340.  However, the

Seventh Circuit said that, even if true, "such is not the stuff of a Voting Rights Act

violation." *Id.*  It reasoned:

> [W]e see no requirement that Chicago alter its legitimate decennial
> redistricting scheme or change its customary four-year term length for
> aldermen in order to avoid the predictable and temporary delay that
> occurs once every twenty years in implementing the new census figures.
> . . .  The four-year terms that Chicago aldermen serve merely indicate
> that every fifth election (*i.e.* when the election year falls on the same
> year that the new census data becomes available) likely will result in a
> four-year delay in using the new census data.   But this simple
> consequence of the two different schedules (*i.e.,* census every ten years,
> elections every four) does not diminish the voting power of any
> protected minority; there is merely a four-year time lag that occurs every
> other decade between redistricting and elections. . . .  As the Supreme
> Court [has] made clear . . . , "Congress enacted the Voting Rights Act of
> 1965 for the broad remedial purpose of ridding the country of racial
> discrimination in voting." Illinois' redistricting scheme does not violate
> that pronouncement.

*Id.* at 341 (quoting *Chisom v. Roemer*, 501 U.S. 380 (1991)).

The same result is required here.  Exactly as in *Daley*, this court is confronted

with four-year terms of office and a decennial redistricting scheme that coincides with

the release of federal decennial census data.  Hence, the intersection of every fifth

election cycle with the publication of federal decennial census data creates the same

four-year delay at issue in *Daley*.  Finding *Daley*'s reasoning persuasive, and no

contrary authority having been cited by Plaintiffs, the court finds that the "time lag

that occurs every other decade between redistricting and elections" neither

impermissibly dilutes African-Americans' voting strength nor denies African-Americans full participation in the election of city council members.  Because the facts alleged fail to state a § 2 Voting Rights Act claim, that claim is due to be dismissed.

## C.   Rule 65:  Preliminary Injunction

Because Plaintiffs' equal protection and § 2 Voting Rights Act claims cannot survive under Rule 12(b)(6)'s standard, Plaintiffs necessarily cannot establish the elements for obtaining a preliminary injunction.  *See Am. Civil Liberties Union of Fla., Inc.*, 557 F.3d at 1198 (defining preliminary injunction elements).  The motion for preliminary injunction, therefore, is due to be denied as moot.

## VI.  CONCLUSION

Plaintiffs ask this court to halt the impending city council election scheduled for August 23, 2011, and to intervene mid-course into the thicket of the City of Montgomery's legislative reapportionment process for redistricting city council districts.  That process is established by Act No. 618, which is a local, precleared law that provides for decennial reapportionment of the City's city council districts, and that is not challenged in this lawsuit.  Because Act No. 618 is a reasonably conceived plan for decennial reapportionment, nothing in the Fourteenth Amendment's Equal Protection Clause or § 2 of the Voting Rights Act requires this court to interfere with

35

the City's legislative function. *Reynolds v. Sims*, 377 U.S. 533 (1964), dictates that conclusion and demonstrates that Plaintiffs fail to state a claim upon which relief can be granted.

Accordingly, it is ORDERED that Defendants' motion to dismiss (Doc. # 10) is GRANTED, and that Plaintiffs' claims are DISMISSED with prejudice, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

It is further ORDERED that Plaintiffs' motion for preliminary injunction (Doc. # 1) is DENIED as moot.

A final judgment will be entered separately.

DONE this 10th day of August, 2011.

_____/s/ W.  Keith Watkins_____
CHIEF UNITED STATES DISTRICT JUDGE

Each Probate Judge, Sheriff, and the Clerk and Register of
the Circuit Court is required by law to preserve this slip or
pamphlet in a book kept in his office until the Act is published
in permanent form.

# ALABAMA LAW

### (Regular Session, 1973)

---

Act No. 618        H. 796—Jones (F), Taylor, Harris, Barron

## AN ACT

To provide a form of municipal government to be known as the
Mayor-Council form of government, which may be adopted by any city
in the State of Alabama having a population of not less than 70,000 nor
more than 135,000 according to the last or any succeeding Federal or
municipal census; to provide the method by which any such city may
adopt the Mayor-Council form of government; to provide for the calling
and holding of elections to vote thereon; to define and provide the legal
status, form of government and powers of any such city under the
Mayor-Council form of government; to provide as the governing body
of such city a city council; to provide for the number of members of
the council, their election and terms of office; to provide the functions,
duties, powers and authority of the city council; to provide for the
election, appointment or designation of officers and employees of the
city and for their qualifications, duties, functions, powers and authority;
to provide for the election, term, qualifications and compensation of a
Mayor and for the filling of vacancies in the office of Mayor and to
provide the duties and authority of the Mayor; to provide for the control
of the finances of such city; to provide for an annual budget its prepar-
ation, submission, and adoption and the effect thereof; to create and
define the powers, functions, duties and authority of the department of
finance and the director of the department of finance; to regulate
purchases and contracts of such city; to provide for the terms and effects
of succession in government of any city adopting the Mayor-Council
form of government; to make various other provisions for any such
city which adopts the Mayor-Council form of government and for the
government thereof; and to provide for the means of abandoning the
Mayor-Council form of government and the adoption by the city of
other forms of municipal government in lieu thereof.

*Be It Enacted by the Legislature of Alabama:*

COURT'S
EXHIBIT NO. A

**Article VII.**   COUNCIL DISTRICTS.

7.02.   Reapportionment.—Whenever there shall be a change in population in any of the nine districts heretofore established, evidenced by a federal census of population published following the last federal census of population preceding the adoption of this act, or by virtue of a change in the corporate limits, there shall be a reapportionment of the council districts in the manner hereinafter provided:

(1) The mayor shall within six months after the publication of each federal census of population for the city, following the last federal census of population preceding the adoption of this act, or if within six months after there shall have been any change in the corporate limits of the city, file with the council a report containing a recommended plan for reapportionment of the council district boundaries to comply with the following specifications:

(a) Each district shall be formed of contiguous and to the extent reasonably possible, compact territory, and its boundary lines shall be the center lines of streets or other well-defined boundaries.

(b) Each district shall contain as nearly as is reasonable the same population.

(2) The report shall include a map and description of the districts recommended and shall be drafted as a proposed ordinance and considered by the council as other ordinances are considered.   Once filed with the clerk, the report shall be treated as an ordinance introduced by a council member.

(3) The council shall enact a redistricting ordinance within six months after receiving such report.   If the council fails to enact the redistricting ordinance within the said six months, the redistricting plan submitted by the mayor shall become effective without enactment by the council, as if it were a duly enacted ordinance.

(4) Such redistricting ordinance shall not apply to any primary or regular or special election held within six months after its becoming effected.   No incumbent councilman or member of the board or commission shall be deprived of his unexpired term of office because of such redistricting.